# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **D.J.D.,** *by and through his father and next friend, Billy Driver*, <br><br>　　**Plaintiff,** <br><br>vs. <br><br>**MADISON CITY BOARD OF EDUCATION,** <br><br>　　**Defendants.** | Civil Action Number <br> 5:17-cv-00096 |

## MEMORANDUM OPINION

Before the court is the Madison City Board of Education's motion for summary judgment, or in the alternative, judgment on the administrative record. Doc. 24. In December 2014, Billy Driver, as father and next friend of D.J.D., a minor, filed an administrative due process complaint against the Board pursuant to 20 U.S.C. §§ 1415(b)(6)(A) and 1415(f)(1)(A). Docs. 21-3 at 121-26; 21-1 at 1-2. Driver alleged that the Board violated the Individuals with Disabilities Education Act ("IDEA") by failing to provide D.J.D. a free appropriate public education ("FAPE"). *Id.* After a hearing officer found in favor of the Board, doc. 21-1, Driver appealed by filing this civil action.[1] Doc. 1. The court granted the Board's partial motion to dismiss Driver's claims for injunctive relief and damages, doc.

---

[1] "Any party aggrieved by the findings and decision made under [the IDEA] shall have the right to bring a civil action" in state or federal court within 90 days from the date of the hearing officer's decision. *See* 20 U.S.C. § 1415(i)(2)(A-B).

12, and the Board now moves for summary judgment on the sole remaining claim Count II, which seeks a declaration that the hearing officer's decision was erroneous, doc. 24. After careful review of the evidence, the court concludes that the motion is due to be granted, and judgment is due in the Board's favor.

I.  **STANDARD OF REVIEW**

For IDEA cases, "the usual [Rule] 56 summary judgment principles do not apply" because no IDEA jury trial right exists. *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313–14 (11th Cir. 2003). As such, a district court may "bas[e] its decision on the preponderance of the evidence" even when facts are in dispute. 20 U.S.C. § 1415(i)(2)(C)(iii). District court judges are permitted to make findings of fact in IDEA cases, and "judgment on the record" is appropriate "even when facts are in dispute," as long as judges "accord due weight to administrative findings" and base their own findings on a preponderance of the evidence. *Id.* Although courts "must be careful not to substitute [their] judgment for that of the state educational authorities, . . . the extent of the deference to be given to the administrative decision is left to the sound discretion of the district court which must consider the administrative findings but is free to accept or reject them." *Walker Cty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297–98 (11th Cir. 2000).

## II. FACTUAL AND PROCEDURAL BACKGROUND

During his fifth grade year at a school in the Madison City School System, D.J.D.'s parents noticed that he began suffering from behavioral difficulties, including "poor attention, poor concentration, non-compliance, excessively high or inappropriate activity levels, frustration, inappropriate social skills, and forgetfulness." Doc. 21-1 at 16. D.J.D's teachers had concerns about his "difficulty in organizational skills, numerous office referrals, and overall noncompliance and disregard for many adult directives." *Id.* Consequently, Driver requested that the Board conduct an evaluation to determine D.J.D.'s eligibility for special education services. *Id.* Consistent with its standard practice, the Board placed D.J.D. in a "pre-referral" intervention program, Problem Solving Team ("PST"), whereby teachers and administrators monitor the child before deciding whether to refer the child for a formal IEP evaluation. Docs. 21-6 at 185-186; 24-1 at 6; 26 at 2.

Unsatisfied with this approach, Driver filed an administrative complaint, alleging that the Board failed to satisfy its child-find obligation. Doc. 21-3 at 121-26. Specifically, the complaint alleged that the Board should have timely referred D.J.D. for an IEP evaluation immediately because it purportedly knew that D.J.D's asthma medication caused hyperactivity. *Id.* After the complaint, the Board assembled an IEP Team and conducted an evaluation using various testing

methods. Doc. 21-1 at 28. One evaluation tool utilized, the Behavior Assessment System for Children ("BASC"), indicated that D.J.D. struggled in several behavioral areas, including functional communication, hyperactivity, attention, adaptability, social skills, and aggression. *Id.* Despite the BASC score, the IEP Team concluded that D.J.D. was ineligible for special education services due to his purported progress in the PST program. Docs. 21-3 at 62-66; 24-1 at 6-8; 26 at 3.

D.J.D's behavioral troubles continued after that, however, resulting in multiple suspensions over the next two months. Doc. 21-1 at 27 (detailing instances of D.J.D. grabbing and throwing other students to the ground). Due to the ongoing issues, Driver amended his administrative complaint to allege that the IEP Team's evaluation process had denied D.J.D. a FAPE by "failing to conduct an adequate functional behavioral assessment." Doc. 21-3 at 62-66. Driver then requested his own medical evaluation of D.J.D. from a licensed psychologist, who diagnosed D.J.D. with Attention Deficit Hyperactivity Disorder ("ADHD") based on his behavioral scores reflecting difficulties with "academics, hyperactivity/impulsivity, separation fears, perfectionistic and compulsive behaviors." Doc. 21-1 at 30-32. About a month later, the Board convened a second IEP Team, which found D.J.D. eligible to receive special education services. Doc. 21-1 at 51.

Ultimately, a state hearing officer heard the complaint at a formal hearing. Doc. 21-1. Driver argued at the hearing that the Board denied D.J.D. a FAPE, in part, because it failed to obtain or conduct a full and comprehensive evaluation to determine whether D.J.D. suffered from behavioral disabilities, including ADD or ADHD. Doc. 21-1 at 54-73. The Board, in turn, argued that it had no duty to conduct such an evaluation because D.J.D. was making progress in the pre-referral intervention program based on teacher observations. Doc. 21-1 at 54-73. The Board argued also that D.J.D.'s subsequent ADHD diagnosis was immaterial to the second IEP's Team's conclusion, which purportedly found D.J.D. eligible because his behavioral problems had increased in severity after the initial eligibility denial. Doc. 21-1 at 54-73. After considering the evidence and the parties' briefs, the hearing officer found in favor of the Board, *id.*, which Driver now asks the court to set aside as erroneous, doc. 1.

### III. ANALYSIS

The IDEA offers federal funds to states to assist in educating children with disabilities on the condition that a "[s]tate pledges to comply with a number of statutory conditions," which include providing FAPE to all eligible children. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). A FAPE must include "specially designed instruction . . . to meet the unique needs of a child with a disability." 20 U.S.C. at §§ 1401(9), (29). To that

end, schools must devise an "individualized education program" for disabled children, otherwise known as an "IEP." *Id.* at § 1401(9)(D). To satisfy its procedural IEP obligation, a school designates an "IEP Team" (comprised of teachers, school officials, and the child's parents) tasked with preparing a "comprehensive plan . . . in compliance with a detailed set of procedures." *Endrew F*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(B)). To meet its substantive IEP obligation, a school must provide an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 997; *see also* 20 U.S.C. at §§ 1401(9).

Relevant here, covered states must also comply with the IDEA's "child find" obligation, which requires its schools to "identif[y], locat[e], and evaluat[e]" "[a]ll children with disabilities residing in the State" to ensure that they receive needed special-education services. 20 U.S.C. § 1412(a)(3)(A). School boards must assess children "in all areas of suspected disability" within 60 days of receiving parental consent for the evaluation. *Id.* at § 1414; 34 C.F.R. 300.304(c)(4). However, the child-find obligation "does not extend to testing every student who is not successful when factors other than a disability would also explain the failure to progress; evaluations are only required when the evidence is sufficient to cause a school system to have a reasonable belief that such an evaluation is necessary." *Jefferson Cty. Bd. of Educ. v. Lolita S.*, 977 F. Supp. 2d 1091, 1124 (N.D. Ala.

2013), *aff'd,* 581 F. App'x 760 (11th Cir. 2014); *see also D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 252 (3d Cir. 2012) (finding that "schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities").

The sole issue before the court is whether the hearing officer erred in finding that the Board did not deny D.J.D. a FAPE when it failed to evaluate him initially for ADHD.[2] Docs. 1 at 13-15; 24-1 at 11-24; 26 at 14-21. Under the IDEA, "the party attacking the IEP bears the burden of showing that the IEP is inappropriate." *Devine v. Indian River Cty. Sch. Bd.*, 249 F.3d 1289, 1292 (11th Cir. 2001). To satisfy this burden, Driver must show that the Board "overlooked clear signs of disability" or "negligently failed to order testing." *Durbrow v. Cobb Cty. Sch. Dist.*, 887 F.3d 1182, 1196 (11th Cir. 2018) (citing *Bd. of Educ. of Fayette Cty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007)). In that respect, Driver maintains that a proper evaluation during the first IEP process would have uncovered D.J.D.'s ADHD diagnosis, which in turn would have allowed the Board to better identify how to meet his needs and provide him a FAPE. Doc. 26. The Board counters that their first evaluation of D.J.D.'s behavior was not inadequate because the school implemented positive behavioral interventions responsive to D.J.D.'s

---

[2] The Board claims that Driver waived this claim because his amended administrative complaint made no mention of "ADHD." Doc. 24-1 at 10. However, as Driver explains, the hearing officer clearly considered his claim that the Board failed to conduct an ADHD evaluation, *see* doc. 21-1 at 16, 30, 39, 56, 63, and nothing in the record indicates that the Board objected to the hearing officer's consideration of the claim.

needs, teachers' evaluations indicated there was no alarming need for specialized education, and his academic performance on classroom material was strong. Doc. 24. Upon consideration, the court agrees with the Board.

Pursuant to the IDEA, the Board had a duty to assess D.J.D. "in all areas of suspected disability." *See* 20 U.S.C. § 1414; 34 C.F.R. 300.304(c)(4). The Alabama Administrative Code § 290–8–9.03(9) provides minimum evaluation criteria that schools must administer to identify and evaluate children suspected of an "Other Health Impairment" ("OHI") disability[3] that "adversely affects their educational performance." Relevant here, evidence must demonstrate that the OHI adversely affects the "educational performance of the child" and interventions and accommodations have been "tried in regular education" classes but "were deemed unsuccessful." Ala. Code § 290–8–9.03(9)(d)(1-4). A student is unlikely to need special education, qualify as a "child with disability," and thus trigger IDEA obligation for a FAPE when: "(1) the student meets academic standards; (2) teachers do not recommend special education for the student; (3) the student does not exhibit unusual or alarming conduct warranting special education; and (4) the student demonstrates the capacity to comprehend course material." *Durbrow v. Cobb Cty. Sch. Dist.*, 887 F.3d 1182 (11th Cir. 2018); *see also L.C. v. Tuscaloosa*

---

[3] OHI refers to chronic or acute health problems limiting a child's "strength, vitality or alertness." 34 C.F.R. § 300.7(b)(8) (1996). Alabama regulations define these chronic or acute health problems as including "asthma, attention deficit disorder or attention deficit hyperactivity disorder…" Ala. Code § 290–8–9.03(9). However, a medical diagnosis alone is insufficient to define an OHI. *Id*.

*Cty. Bd. of Educ.*, 2016 WL 1573269, at *5 (N.D. Ala. Apr. 19, 2016) (finding that the student's "testing and academic achievement," including mastering grade level standards and meeting benchmarks, failed to demonstrate how the disability caused "requisite adverse effects necessary to qualify him for special education services during the time at issue."). In other words, a "school's failure to diagnose a disability at the earliest possible moment is not per se actionable" as a denial of FAPE. *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 226 (D.Conn.2008) (finding that some disabilities "are notoriously difficult to diagnose [early] and even experts disagree about whether [some] should be considered a disability at all.").

Based on the record here, the court finds that the school did not overlook "clear signs of disability" behavior and were not "negligent in failing to order testing," *Durbrow*, 887 F.3d at 1196, because the school had a "rational justification for not deciding to evaluate" at the first IEP meeting. *Clay T. v. Walton Cty. Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997). First, the extensive record indicates a murky picture about D.J.D.'s school life—although he exhibited classroom misbehavior, his teachers did not recommend him for special education because he demonstrated a capacity, often times above average, to

comprehend class material.[4] Doc. 21-1. More specifically, the evidence at the hearing showed that he was often reprimanded during the six months before the first IEP Team's determination, usually for loud, disrespectful behavior, disrupting class, or refusing to follow instructions. Doc. 21-1 at 21-23. However, as the hearing officer noted, nearly all the witnesses from D.J.D.'s school testified that they did "not see an educational impact [from D.J.D.'s behavior] as far as academic work."[5] Doc. 21-5 at 71. The court finds no error in the hearing officer's decision to show deference to the teachers. After all, because "a federal district court does not have the expertise or experience in the field of education presumably possessed by professional educators," courts "grant deference to the evaluations of [the student's] teachers and the school officials" when signs of disability are not readily clear. *Clay T.*, 952 F. Supp. at 823.

Second, the school justified its decision by showing that the first IEP team used pre-referral intervention before placing D.J.D. in special education, as schools are encouraged to use "measures besides special education to assist struggling students." *Durbrow*, 887 F.3d at 1196 (noting that a school is "less likely" to

---

[4] Although "behavior rating scales [are] a portion of a child's full psychological evaluation or educational assessment," the Board at the first IEP meeting considered that D.J.D. performed at "[at] or above on the IQ measure" and "[at] or above on the academic achievement portion." Doc. 21-1 at 38. Additionally, the school noticed a "significant difference in a reduction in the number of office referrals after the PST plan [was] put in place." *Id.*

[5] The Board cited evidence that D.J.D.'s grades included "a 97 in Reading, 87 in Math, and a 90 in Language," as well as START scores of 4.7 in Reading and 5.3 in Math. Doc. 21-20; Doc. 21-1 at 19. One teacher described him as an "A student" who never "average[d] less than 96." Doc. 21-4 at 48.

breach its child-find duty when it implements such measures). By implementing the specialized pre-referral intervention program, the school provided additional services designed to aid D.J.D, including acknowledging feelings, giving a lot of attention when actually compliant, sitting next to positive role models, lunch with peers, and teaching relaxing techniques and self-control strategies. Doc. 21-5 at 67. Although the interventions proved only moderately successful,[6] D.J.D. "was still meeting expectations in all academic areas." *Bd. of Educ. of Fayette Ct*y*., Ky. v. L.M.*, 478 F.3d 307, 314 (6th Cir. 2007). *See also Hupp v. Switzerland of Ohio Local Sch. Dist.,* 912 F. Supp. 2d 572, 592 (S.D. Ohio 2012) (noting that the school district "forwent an evaluation for a period of less than six months, during which time interventions were being implemented consistent with [state] law and [student] was experiencing academic success."). Therefore, the court finds no error in the hearing officer's decision to accept this rationale for the Board's decision. Indeed, as the Eleventh Circuit recently found, a school district did not violate its child find duty when the district "could not have known [the student] needed special education since he generally performed well in his classes and did not exhibit alarming behavior or other clear signs of disability." *Durbrow*, 887

---

[6] The first IEP meeting noted that "behavior is a huge parameter that does not get changed overnight" and D.J.D. "was showing success" within the "general education setting" since his "response to redirection was more accepted." Docs. 21-6 at 108; 21-8 at 174-176. One of his three teachers noted that "[h]is response and reaction" to administration and "teacher correction" improved, while another teacher stated that on some days D.J.D was "very defiant" and then other days "he was a model student," thus indicating that his behavior "varied from day to day between August and December 2014." Doc. 21-11 at 22-23.

F.3d at 1196; *cf. N.G. v. D.C.,* 556 F. Supp. 2d 11, 29–30 (D.D.C. 2008) (finding a denial of FAPE when the school was explicitly informed of her diagnosis on multiple occasions, was aware of her severe emotional disturbances, and had ample evidence that they adversely impacted her academic performance).

Lastly, Driver's contention that the school "should have" tested for ADHD at the first IEP meeting because "within weeks of denying eligibility, D.J.D. was diagnosed with having met the criteria for ADHD, Oppositional Defiant Disorder, and Conduct Disorder," doc. 26 at 8, is also unavailing. An "individualized education program (IEP) must be evaluated in light of the 'snapshot rule,' which instructs a reviewing court to judge an IEP not in hindsight." *Dep't of Educ. of Hawaii v. Leo W. by & through Veronica W.*, 226 F. Supp. 3d 1081 (D. Haw. 2016). The court must base its decision instead "on the information that was reasonably available to the parties at the time of the IEP." *Id.* Relevant here, the Board argues that it decided to conduct a second IEP months after the first one because D.J.D. began to exhibit more physical aggression leading to office referrals.[7] Because some disabilities "are notoriously difficult to diagnose," *A.P.,* 572 F. Supp. 2d at 226, the court finds that the hearing officer did not err when he

---

[7] In March 2015, D.J.D. received in school suspension "for throwing pencils across the room and mocking teachers by staying 'blah, blah, blah' while they were talking." Doc. 21-8 at 45. Later that month, D.J.D. grabbed another student around the neck and tried to throw him on the ground. Doc. 21-1 at 27. Records indicate that after this incident D.J.D. received his first out of school suspension and parent conference. *Id.* His teachers noted that his behavioral problems started "picking back up," which caused the school to conduct a second IEP that led to an ADHD finding. *Id.*

found that the first IEP team had no duty to evaluate for ADHD because D.J.D.'s classroom behavior fluctuated, the school's behavioral intervention strategies attempted to target his areas of difficulty, and he "generally performed well in his classes." *Durbrow*, 887 F.3d at 1196. The record indicates that D.J.D.'s teachers made a conscientious effort to tailor, implement, and monitor his behavioral interventions.

## CONCLUSION

For all these reasons, the court concludes that the Board adequately evaluated D.J.D.'s behavior and the hearing officer's decision was not erroneous as to Count II. Therefore, the court finds that Driver failed to demonstrate that the Board denied D.J.D. a FAPE. *See Durbrow*, 887 F.3d at 1196. The court will issue a separate order granting the Board's motion.

**DONE** the 7th day of September, 2018.

                                                                    _____
                                                                           **ABDUL K. KALLON**
                                                                    UNITED STATES DISTRICT JUDGE